**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
      lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRAM VAN BOXTEL, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>TENET FINTECH GROUP INC. F/K/A PEAK FINTECH GROUP INC., JOHNSON JOSEPH, and JEAN LANDREVILLE,<br><br>    Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Bram van Boxtel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Tenet Fintech Group Inc. f/k/a Peak Fintech Group Inc. ("Tenet Fintech" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that

1

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Tenet Fintech securities between September 2, 2021 and October 13, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Tenet Fintech securities during the Class Period and was economically damaged thereby.

7.      Defendant Tenet Fintech purports to be the parent company of a group of innovative financial technology ("fintech") subsidiaries operating in China's commercial lending industry. Tenet Fintech is incorporated in Canada and its headquarters is located at 550 Sherbrooke West, Suite 265, Montreal A8 H3A 1B9. Tenet Fintech's shares trade over-the-counter ("OTC") under the ticker symbol "PKKFF." On September 9, 2021, Tenet Fintech's shares began trading on the NASDAQ exchange under the ticker symbol "TNT". Immediately prior to market open on September 30, 2021, Tenet Fintech's shares were delisted from the NASDAQ exchange and resumed trading OTC under the ticker symbol "PKKFF". On October 27, 2021, the Company officially changed its name from Peak Fintech Group Inc. to Tenet Fintech Group Inc.

8.      Defendant Johnson Joseph ("Joseph") has served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

9.      Defendant Jean Landreville ("Landreville") has served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

10.     Defendants Joseph and Landreville are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

        (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

        (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     Tenet Fintech is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Tenet Fintech under *respondeat superior* and agency principles.

14.     Defendants Tenet Fintech and the Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

15.     The Class Period begins on September 2, 2021, when Tenet Fintech, then known as Peak Fintech Group Inc., filed its Form 40-F registration statement with the SEC. Attached to the Form 40-F was, *inter alia*, an annual information form for the financial year ended December 31, 2019 (the "2019 Annual Information Form").

16.     The 2019 Annual Information Form depicted the Company's corporate structure, which showed that the Company, through its wholly owned subsidiary Wuxi Aorong Ltd. ("Wuxi"), owned 51% of Asia Synergy Financial Capital Ltd. ("ASFC"). In relevant part, the 2019 Annual Information Form stated:

> "In January 2018, the Company announced the creation of a new Chinese holding subsidiary in the city of Wuxi. The new Wuxi Aorong Ltd. holding subsidiary was created ahead of the official registration of Asia Synergy Financial Capital ("ASFC") for the purposes of being the parent company of ASFC and **the vehicle through which Peak would hold a 51% stake in ASFC.**"

> (Emphasis added.)

17.     On September 9, 2021, the Company's shares were uplisted and began trading on the NASDAQ under the ticker symbol "TNT".

18.     On September 14, 2021, the Company issued a press release announcing the acquisition of the Heartbeat Insurance Platform. In pertinent part, the press release stated:

> "Peak Fintech Group Inc. (CSE: PKK) (NASDAQ: TNT) ("Peak" or the "Company"), an innovative Fintech service provider and manager of the Cubeler Business Hub, today announced that **it has acquired the assets of Huayan Kun Tai Technology Company Ltd. ("Huayan")**, a private company that provides various SaaS (software as a service) solutions to insurers and insurance brokers in China.

> **Huayan provides its solutions primarily through its proprietary "Heartbeat" (https://www.happysalers.com) insurance product management and brokerage platform, where users pay a subscription fee to access the services plus a commission-related service fee when applicable.** All of Huayan's assets, including the Heartbeat platform, its employees and its operations will be transferred to Peak's Xinxiang Technologies Ltd. subsidiary ("Xinxiang"), which was created in the second quarter of 2021 specifically to help bring insurance related products and services to members of Peak's Business Hub.

> *      *      *

> **The Heartbeat platform saw a significant increase in the number of insurance brokerage companies using it in 2021 with the number of users going from 8 at the end of 2020 to 420 by the end of August 2021.** The increase is largely

attributed to recent regulations enacted by China's Banking and Insurance Regulatory Commission (CBIRC) aimed at providing better supervision of the insurance brokerage industry and improving the industry's collection and management of data. The new regulations, which were implemented on February 1, 2021, essentially require all insurance brokers to have systems that allow them to share data with, and that are directly linked to, the country's insurance companies. As the Heartbeat platform is one of only a handful of platforms that offer such capabilities to the Chinese insurance brokerage industry, insurance brokers, who have until February 1, 2022 to comply with the new regulations or run the risk of having to shut down their operations, have been flocking to the platform. Heartbeat is currently linked to China's top insurance companies, including Ping An Insurance (Group) Ltd., China Life Property & Casualty Insurance Company Ltd., The People's Insurance Company (Group) of China Ltd., and Bank of China Insurance Company Ltd."

(Emphasis added.)

19.     The statements referenced in ¶¶16 and 18 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company did not own 51% of ASFC through Wuxi Aorong; (2) the Company did not disclose its actual ownership structure of ASFC, an undisclosed and potentially problematic nominee shareholder agreement; (3) Huayan did not own the Heartbeat platform; (4) the Heartbeat platform did not exist prior to the alleged acquisition; (5) the Company faced imminent delisting from NASDAQ due to non-compliance with known regulations; and (6) as a result of the foregoing, defendants' public statements were materially false and/or misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

20.     On September 21, 2021, the Company issued a press release stating that NASDAQ and the SEC advised the Company that the review of its Form 40-F was taking longer than originally

expected. As such, trading of the Company's shares on the NASDAQ was temporarily halted.

The press release stated, in relevant part:

> "Peak Fintech Group Inc. (CSE: PKK) (NASDAQ: TNT) ("Peak" or the "Company"), an innovative Fintech service provider and manager of the Cubeler Business Hub, today announced that it has been ***advised by the Nasdaq Capital Market ("NASDAQ") that the US Securities and Exchange Commission (the "SEC") is still in the process of reviewing the Company's registration statement, known as Form 40-F. As the review process is taking longer than originally expected, trading of Peak's common shares on the NASDAQ has been temporarily halted until the SEC completes its review and issues the notice of effectiveness of the Company's Form 40-F.***"

> (Emphasis added.)

21. On September 28, 2021, the Company issued a press release stating that it would withdraw its Form 40-F filed with the SEC. The press release stated, in pertinent part:

> "Peak Fintech Group Inc. (CSE: PKK) (NASDAQ: TNT) ("Peak" or the "Company"), an innovative Fintech service provider and manager of the Cubeler Business Hub, today announced that it has ***voluntarily withdrawn its Form 40-F (registration statement) filed with the U.S. Securities and Exchange Commission (the "SEC") while it works to comply with recent disclosure guidance provided by the SEC for companies either based in China or with the majority of their operations in China (the "Guidance")***.

> Without an effective Form 40-F filed with the SEC to register the Company's common shares under Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), ***the Company's common shares will no longer be listed on the Nasdaq Capital Market (the "NASDAQ") as of immediately prior to market open on Thursday September 30, 2021***."

> (Emphasis added.)

22. On September 30, 2021, the Company's shares began trading on the OTC under the ticker symbol "PKKFF." As a result of the delisting from NASDAQ, the Company's share prices fell $1.59, or over 17%, from closing at $9.09 on September 20, 2021, to open at $7.50 on September 30, 2021.

23. The statements referenced in ¶¶ 20-21 above were materially false and/or misleading

because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the "recent disclosure guidance" was in fact published on November 23, 2020, nearly a full nine months prior to the Company's uplisting; and (2) as such, the Company knew or should have known that its 40-F submission was deficient.

24.     On October 1, 2021, the Company issued a press release announcing the acquisition of Cubeler Inc. ("Cubeler"). In relevant part, the press release stated:

> "Peak Fintech Group Inc. (CSE: PKK) ("Peak" or the "Company"), an innovative Fintech service provider and manager of the Cubeler Business Hub, today announced that it has ***officially acquired analytics and AI company Cubeler Inc. ("Cubeler").***
>
> Cubeler (https://www.cubeler.com/) is the developer and owner of the technology that powers Peak's Business Hub. Peak first announced its intension [sic] to acquire Cubeler on August 16, 2021 pending satisfactory due diligence, a pricing report on Cubeler and a fairness opinion from an independent third party on the proposed acquisition. ***Peak is pleased to announce that it has now acquired 100% of Cubeler's issued and outstanding shares form [sic] Cubeler's shareholders in exchange for $1,000,000 in cash and 11,133,012 common shares of Peak (the "Acquisition")***. Under the terms of the Acquisition, the Peak common shares received by Cubeler's shareholders will initially be restricted for a four-month period, following which 50% of the shares will be free-trading and the remaining 50% will be released and become free-trading over a two-year period on the anniversary date of the closing of the transaction.
>
> \*       \*       \*
>
> ***The Acquisition is expected to constitute a "related party transaction"***, as defined within the meaning of Multilateral Instrument 61-101 Protection of Minority Security Holders in Special Transactions ("MI 61-101"), as Johnson Joseph, Chief Executive Officer and director of Peak; Liang Qiu, director of Peak; Jean Landreville, Chief Financial Officer of Peak; Charles-André Tessier, director of Peak; and Mark Dumas, director of Peak (collectively the "Related Parties"), are all shareholders of Cubeler. The Acquisition will be exempt from (i) the formal valuation requirements of Section 5.4 of MI 61-101 by virtue of Subsection 5.5(a) of MI 61-101, and (ii) the minority shareholder approval

requirements of Section 5.6 of MI 61-101 by virtue of Subsection 5.7(1)(a) of MI 61-101 on the basis that the fair market value of the consideration to be received by the Related Parties shall not exceed an amount equal to 25% of Peak's market capitalization."

(Emphasis added.)

25. The statements referenced in ¶ 24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Cubeler historically failed to make even minimum loan repayments to the Company; (2) the Company, instead of exercising its right on the assets, decided to purchase Cubeler; and (3) in light of the foregoing, and in consideration of the fact that Cubeler is owned by several Company insiders, the Company's acquisition of Cubeler is not based on legitimate business interests.

26. On October 4, 2021, market analyst Grizzly Reports published a report discussing and analyzing the Company (the "Analyst Report"). The Analyst Report stated that the Company's acquisition of Heartbeat was rife with factual inaccuracies and suspicious transactions. Specifically, the Analyst Report stated:

"PKK [Peak Fintech] paid $31m to Huayan, *but Huayan does not own Heartbeat. The asset is registered under another company called Beijing Huike.*

\*     \*     \*

*[The] official filing of Beijing Huike Hulian Technology Ltd. ("Beijing Huike") [] discloses Beijing Huike has registered Heartbeat* (https://www.happysalers.com)[.]

We ran several checks to determine Heartbeat is truly registered under Beijing Huike and not Huayan.

First, we searched the registry of China's Ministry of Industry and Information Technology ("MIIT"). When a company registers with MIIT, the information is retained and becomes publicly searchable on the organization's website.

Entering Beijing Huike's Chinese name 北京惠轲互联科技有限公司 in MIIT's ICP [Internet Content Provider] Information Registration Management System [. . .] *confirms that Beijing Huike is the registered owner of Heartbeat (www.happysalers.com), and that this registration was approved on March 22, 2021* (about half a year ago).

We made sure to verify whether Beijing Huike could be a subsidiary of Huayan and confirmed that this is not the case.

The [] SAIC [China's State Administration for Industry and Commerce] filing states Beijing Huike was established on March 13, 2019, and its registered capital at the time of its establishment was RMB 1M (~USD 156K). Its registered capital suspiciously increased to RMB 20M (~USD 3M) on March 25, 2021. On the same date, *an individual named Kai Cui took 100% ownership of the company. Remarkably, according to this SAIC information, it is Kai Cui, not Huayan, who owns 100% of Heartbeat through Beijing Huike.* Thus, we can confirm that the $31m which was supposed to be directed to Huayan for Heartbeat should have been paid straight to Beijing Huike.

\*       \*       \*

We obtained the SAIC financial data for Beijing Huike, which really owns the Heartbeat platform. We were shocked to find that *Beijing Huike had generated no revenues in both 2019 and 2020*! As of 2020, Beijing Huike's total assets were only $296, with a negative $59 shareholder equity!

\*       \*       \*

Recall that *the press release for the acquisition of Heartbeat was announced on September 14th 2021* [sic]. We find it amazing how *the first available capture from internet archive website, Wayback Machine, also occurred on September 14th, 2021. The archive shows nothing but a placeholder webpage.*

It was not until September 19th 2021 [sic], that the second capture of the website was recorded. This archive displays Hearbeat's website they have today.

We believe this timeline casts substantial doubt over how real the supposedly growing insurance platform, Heartbeat, really is. *It appears PKK created the website just to support the narrative the company acquired a budding platform "to bring Analytics and AI expertise to the platform."*

To be sure PKK did not just pull it out of thin air and these web archives were not missing anything, we consulted web-traffic data providers for Heartbeat stats. Of course, this exercise only confirmed our suspicion that this acquisition was completely misrepresented.

***While one would expect web traffic to increase with the injection of so many new insurance brokerages, our research on Heartbeat's website traffic indicates otherwise.*** We consulted platforms including Alexa, Similar- web, and Baidu Index.

### Alexa

Alexa has limited info on Heartbeat's traffic data and ranked the website behind almost 4 million similar sites.

### Similarweb

SimilarWeb, another well-known web analytics outlet also lacks any information on Heartbeat's web traffic.

### Baidu Index

As Heartbeat is a Chinese platform, one may argue slim results from Alexa and Similarweb are because they incorrectly track its traffic. Yet, ***Baidu Index, a native internet keyword popularity tracker, yields the same results. Baidu Index has not even included the Heartbeat keyword on its search database.***

***Not only were we unable to find any meaningful web interested in Heartbeat or its website, but we also did not find any mention of the platform on China's largest search engine, Baidu.***

We believe Heartbeat's nonexistent revenue, website history, website-traffic, call the $31m paid for the asset into question even ignoring our concerns expressed over the management and structure of the deal."

(Emphasis added.)

27. The Analyst Report also alleged that the Company did not own ASFC. Although the Company purports to own 51% of ASFC through its wholly-owned subsidiary Wuxi Aorong, the Analyst Report refutes this claim, stating, in pertinent part:

"***5 individuals own 100% of ASFC.*** We crossed checked for share pledges from these shareholders to other parties, but there are none. ***In other words, PKK does not own any equity interest in ASFC, despite claiming 51% ownership in the***

*entity for years.* Of the 5 shareholders listed as owners of the company, only Changsheng Zhuo appears connected to PKK. ***Since when does 15% equity ownership by a one specific management equate to a company owning a subsidiary?***

\*          \*          \*

***In 2019, ASFC's revenues account for 29.1% of PKK's total.*** ASFC's total assets and equity account for the majority of Peak Group's total assets and equity, especially for 2019.

PKK claims to own ASFC through its wholly-owned subsidiary Wuxi Aorong Ltd. ("Wuxi Aorong"). We also checked the SAIC information of Wuxi Aorong Ltd. [. . .] ***Wuxi Aorong 100% owned by Asia Synergy, but does not have any subsidiaries[.]***"

(Emphasis added.)

28.     The Analyst Report also alleged that the Company's acquisition of Cubeler Inc.

"evidence[d] self-dealing." In pertinent part, the Analyst Report stated:

"In 2017, the company mentioned Cubeler Inc. For the first time and noted that Cubeler is a privately held company whose shareholders are also shareholders of the Company.

In 2018, PKK changed disclosures and state that Cubeler was a privately held company who has certain shareholders in common with the Company.

Cubeler's financial arrangement with the company also screams caution as ***management had paid advances to Cubeler and when Cubeler fails to fully pay the advance, the company decided "not to execute the right on the assets considering the low value of the advances".*** [. . .]

***This is concerning because the advance to the company was ~5% of cash which was obtained through financing just prior. PKK is effectively taking invested dollars from shareholders and directing them into their own pockets.***

Ironically, ***despite Cubeler failing to fully pay advances of a minimal amount, PKK found it accretive to acquire Cubler in October 2021 for $1m in cash and over 11M in PKK shares, equivalent to ~CAD 110M in total consideration.*** Considering the related party nature of the transaction, and the fact that Cubeler failed to repay its past advances, we highly doubt the economic essence of this transaction and suspect the sole motivating factor behind it to enrich PKK's insiders at the expense of shareholders."

(Emphasis added.)

29.     On October 5, 2021, the Company published a question and answer responding to specific allegations in the Analyst Report (the "Q&A Response"). In the Q&A Response, Defendant Joseph purported to debunk the allegations in the Analyst Report. In relevant part, the Q&A Response stated:

> "SF [StockFam]
> Ok then, let's get right into it. The report claims that you are essentially using your announced acquisition of the Heartbeat insurance platform as a scam to send $31M to some criminal associates in China. It's saying that the company that you are buying, Huayan doesn't even own the Heartbeat platform, that it's actually owned by another company called Huike. What is your response to these allegations?
>
> JJ [Johnson Joseph]
> First of all, if you read our news release of September 14, you will see that we never said we were buying Huayan. What we said is that we are acquiring all the assets of Huayan, not the company itself. Now what kind of respectable research company would not even bother getting such a simple fact like that right? ***Huayan and Huike are affiliated companies owned by the same people and that's who our transaction is with***. When we make acquisitions, we prefer to acquire the assets, IP, clients, management and employees. That way we get all the benefits and avoid any potential skeletons that may be hiding in the company. ***So before proceeding with this transaction, we asked Huayan to transfer all its IP, including the Heartbeat platform, to Huike back in March***. Until that time, Huike was an empty shell owned by Kai Cui without even a bank account, so we felt it would be a safe place to park the assets until we could finalize our deal with Huayan's shareholders. With the deal we have in place, we get all the assets from Huayan and Huike. We're not idiots, no payment will be made, most of it in shares anyway, until the assets are transferred to our new subsidiary, which we created specifically to take over Huayan's operations. We have plans to keep Huayan in the picture, for marketing and branding reasons, because of its relationship with some important clients.
>
> SF
> What about the issue that Huike or Heartbeat hasn't been around that long and isn't generating any revenue?
>
> JJ
> Like I said, up until March of this year, Huike was an empty shell. So it's normal that it hasn't generated any revenue. Again, this is just more sloppy research by this outfit. ***The operating company leveraging the Heartbeat platform until this***

*year was Huayan.* But let me point you back to our September 14 news release again. What Heartbeat was being used for before, its SaaS offering, was not what attracted us to the platform. It's the new regulations passed by the government forcing insurance brokers to be directly connected to the insurance companies and the fact that Heartbeat's owners saw this coming and we able to adjust the platform to take advantage of the opportunities that the new regulations would create. So, there was Heartbeat before 2021 and Heartbeat as of 2021. What we got our hands on is Heartbeat as of 2021. We'll let the numbers speak for themselves and our shareholders will be able to judge for themselves if we got good value for our investment.

SF

One last question about Heartbeat. How do you explain the low volume of traffic if the platform is so popular?

JJ

This is not a news content or ecommerce website where people go to every day to get information or shop. This is password protected application meant to be accessed by clients only. It's also a well-known fact that web crawlers used by Google and the likes to measure web traffic can't get past password protected sites. So they can't really measure the level of activity that would take place on the platform anyway.

*      *      *

SF

Moving on to ASFC, what's the story there? Peak is supposed to own 51% of ASFC, but the report claims otherwise. Please enlighten us.

JJ

Guys, I appreciate you giving me this opportunity to address this report, but seriously, what a waste of time. All they had to do was actually do just a little bit of real research and they would see that *the three individuals listed as shareholders of ASFC are principles of Jiu Dong. If you recall, Jiu Dong is the company we partnered with to create ASFC, which owns 49% of ASFC while we own the 51% majority stake. Because of financial regulations at the time of its creation, we were advised that it would be better to have local Chinese individuals or companies hold our shares in ASFC on our behalf. So two of the three Jiu Dong principles holding shares in ASFC are holding those shares, representing a 30% stake, on our behalf through what's called a nominee shareholder agreement, which is perfectly legal and acceptable in China. The remaining 21% is being held on our behalf by the two companies listed as shareholders in ASFC.* Again, this is something that can easily be verified with a minimum amount of research.

SF

14

I'll only ask the question, as ridiculous as it may sound, only because it was alleged in the report. Can you please tell us what happened with the $10.4M that Peak invested in ASFC and that this report is suggesting went into insiders' or management's pockets?

JJ
We invested $10.4M and our Jiu Dong partners invested $9.6M for a total of $20.0M. That $20.0M is simply the capital used by ASFC to lend to SMEs [small and medium-sized enterprises], which is still in the company's books. Did I mention how great I thought this "research" was?"

(Emphasis added.)

30.     The statements referenced in ¶ 29 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) there is no evidence Huayan ever owned the Heartbeat platform or that it transferred the asset to Huike; (2) the Heartbeat website did not exist until September 14, 2021 and even then only as a placeholder webpage; (3) the largest ASFC shareholder had his shares frozen due to court sanctions; and (4) the creation of ASFC itself was likely a related-party transaction.

## THE TRUTH FULLY EMERGES

31.     On October 13, 2021, Grizzly Reports published a rebuttal report to the Company's Q&A Response (the "Rebuttal Report"). The Rebuttal Report expanded on the original Analyst Report regarding the Company's purported ownership in ASFC. In relevant part, the Rebuttal Report said:

"***There are five major ASFC shareholders owning 35%, 20%, 15%, 15%, and 15%, respectively.*** Johnson claims two of these holders executed a nominee shareholder agreement with PKK to own 30% of the company on their behalf. He adds, "The remaining 21% is being held on our behalf by the two companies listed as shareholders in ASFC.""

The first giveaway is in the numbers. ***What combination of the above numbers generates 21%? Who are the two shareholders that hold on behalf of PKK, and which two companies hold shares totalling*** [sic] ***21% on behalf of PKK?*** Of course, ***documents related to the nominee shareholder agreement would clear this up, but PKK has neglected to share these documents with investors***.

[In previous public statements,] ***PKK provided ample details regarding ASFC but failed to mention the nominee shareholder agreement***. In addition, in their press release on January 31, 2018, PKK ***specifically stated that Wuxi Aorong was created to be the holding company for ASFC's 51% stake***, but as we have shown in our previous report that Wuxi Aorong never had any subsidiaries under the SAIC registry.

As for the "nominee shareholder agreement", ***across the hundreds of North American-Listed Chinese Companies, we rarely see this sort of ownership structure which Joseph claims they elected to choose "because of financial regulations at the time of its creation"***. This is a weak excuse to obfuscate the actual environment. ***Most foreign-operating, North American-listed companies utilize a traditional VIE structure instead of using an "undisclosed nominee shareholder agreement". Shares are typically pledged and traceable on the SAIC under the VIE agreement, whereas the "undisclosed nominee shareholder agreement" is a black box to investors and under certain circumstances, not legally enforceable***.

Furthermore, assuming PKK was referring to this regulation[1], where foreign ownership is restricted on Chinese Financial companies, we note that this constraint was promptly relaxed in 2019. We question why the company did not choose to revert its obscure arrangement and use a direct ownership or VIE structure.

Another compelling reason to disbelieve Joseph's statements about ASFC is these regulations did not prevent PKK from establishing other Chinese subsidiaries through traditional structures. For example, in 2017 PKK was able to establish the 100% fully owned subsidiary Asia Synergy Data Solutions Ltd. ("ASDS", 上海尊方数据科技有限公司). The company was then able to hold 51% of Asia Synergy Supply Chain Ltd ("ASSC", 江苏金尊供应链管理科技有限公司) through ASDS. This would have been the proper way to get ownership of ASFC and Jinxiaoer as well, but PKK failed to follow the process in these instances."

(Emphasis added.)

---

[1]   The Rebuttal report linked to the following Chinese-language website: https://www.sohu.com/a/339977222_120166858.

32.     The Rebuttal Report included new issues with the Company's statements regarding

ASFC. In relevant part, the Rebuttal Report stated:

> "Since our initial report, we have uncovered SAIC information that *the largest shareholder of ASFC, Yixing Langyi, was sanctioned by the court* (details of the case were not disclosed). *Langyi's ASFC shares have been frozen since Sept 6th, 2021*.
>
> Provided PKK does have this "nominee shareholder agreement" (again, very uncommon) in place, PKK claims that two companies hold 21% on their behalf. Notice that no single company has over 20% ownership according to SAIC filings. Moreover, *it is most likely that the largest shareholder Yixing Langyi would be the majority holder of the 21%, if not all*.
>
> Thus, *if Yixing Langyi was indeed holding shares on behalf of PKK, those shares are now frozen by the Chinese government. Why has PKK not disclosed this to its investors*?"
>
> (Emphasis added.)

33.     Additionally, the Rebuttal Report presented evidence suggesting the creation of ASFC

was an undisclosed related party transaction. In relevant part, the Rebuttal Report said:

> "We provide additional evidence to investors given Johnson's emphasis on Jiu Dong. Johnson states the company partnered with Jiu Dong to establish ASFC. However, *this is another one of the company's undisclosed related party transactions*.
>
> According to third-party websites and ownership disclosures, Jiu Dong's Chinese name is 江苏玖东实业 发展有限公司 (Jiangsu Jiu Dong Industrial Development Co., Ltd. "Jiu Dong").
>
> *Jiu Dong shared phone numbers with another company* called 无锡鼎皓佳业信息科技有限公司 (Wuxi Dinghao Silicon Information Technology Co., Ltd., "*Wuxi Dinghao*"). *Liang (Golden) Qiu became Wuxi Dinghao's 100% shareholder and Legal Representative in November 2017*. Yes, the same Liang (Golden) Qiu in our report, the *CEO of Peak Group China*, who co-founded the black-listed company LongKey Software. Interestingly, PKK also chose to ignore this in their rebuttal.
>
> Liang (Golden) Qiu became the Legal Representative and 100% shareholder of Wuxi Dinghao on November 7, 2017.

*ASFC was established on May 13, 2018, which is about half a year after Liang (Golden) Qiu became the 100% shareholder of Wuxi Dinghao*. And Wuxi Dinghao shares the same phone number as Jiu Dong. And before that, Wuxi Dinghao used to share the same phone number with Jiu Dong before Liang (Golden) Qiu took over Wuxi Dinghao.

To facilitate the understanding of the convoluted network of undisclosed related parties, we illustrated the following connections:



We believe *through its relationship with PKK's China CEO, Liang (Golden) Qiu, Jiu Dong is an undisclosed related party.*"

(Emphasis added.)

34.    The Rebuttal Report also highlighted Defendant Joseph's misstatements regarding the

Heartbeat acquisition in the Q&A Response. Specifically, the Rebuttal Report states:

"**The CEO admits Beijing Huike was an empty shell (as we reported) up until earlier this year**, but states this as though it were publicly known. On the contrary, we have found no evidence of such disclosure prior to our report.

Troubling indeed, we take further issue with the response because it misrepresents Heartbeat's status pre-acquisition. As Joseph tells it, "The operating company leveraging the Heartbeat platform until this year was Huayan", **but this statement appears noticeably false**.

In its September 14, 2021 announcement[2] of the Heartbeat acquisition, PKK emphasizes Huayan's primary solution is "Heartbeat" (www.happysalers.com). For this to be accurate, Heartbeat and the website, www.happysalers.com, would have been registered under Beijing Huayan before being transferred to Beijing Huike.

Yet, there is no evidence to support these claims either. According to MIIT, which hosts website data on all registered Chinese entities, www.happysalers.com **was never registered under Beijing Huayan.** In fact, **the only website which has been registered under Beijing Huayan** is www.wabestway.com, which **appears to be a car insurance provider**[.]"

(Emphasis in original.)

35.    On this news, the Company's share prices dropped by $0.57 per share, or 6%, to close at $7.98 on October 13, 2021, damaging investors.

36.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Tenet Fintech securities publicly traded during the Class Period (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Tenet Fintech, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

---

[2] Links to the following press release: https://www.prnewswire.com/news-releases/peak-fintech-acquires-heartbeat-insurance-platform-and-brings-analytics-and-ai-expertise-to-insurance-industry-301376176.html.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tenet Fintech securities were actively traded OTC and on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Tenet Fintech;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Tenet Fintech to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Tenet Fintech securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

43.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Tenet Fintech securities met the requirements for listing, and were listed and actively traded OTC and on the NASDAQ, efficient markets;

- As a public issuer, Tenet Fintech filed periodic public reports;

- Tenet Fintech regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Tenet Fintech's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Tenet Fintech was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

44. Based on the foregoing, the market for Tenet Fintech securities promptly digested current information regarding Tenet Fintech from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

45. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

46. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tenet Fintech securities during the Class Period.

50.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Tenet Fintech were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Tenet Fintech, their control over, and/or receipt and/or modification of Tenet Fintech's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Tenet Fintech, participated in the fraudulent scheme alleged herein.

51.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose

the true facts in the statements made by them or other Tenet Fintech personnel to members of the investing public, including Plaintiff and the Class.

52.     As a result of the foregoing, the market price of Tenet Fintech securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Tenet Fintech securities during the Class Period in purchasing Tenet Fintech securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

53.     Had Plaintiff and the other members of the Class been aware that the market price of Tenet Fintech securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Tenet Fintech securities at the artificially inflated prices that they did, or at all.

54.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

55.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Tenet Fintech securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

56.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.     During the Class Period, the Individual Defendants participated in the operation and management of Tenet Fintech, and conducted and participated, directly and indirectly, in the conduct of Tenet Fintech's business affairs. Because of their senior positions, they knew the adverse non-public information about Tenet Fintech's misstatement of revenue and profit and false financial statements.

58.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tenet Fintech's financial condition and results of operations, and to correct promptly any public statements issued by Tenet Fintech which had become materially false or misleading.

59.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tenet Fintech disseminated in the marketplace during the Class Period concerning Tenet Fintech's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tenet Fintech to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tenet Fintech within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tenet Fintech securities.

60.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tenet Fintech.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 19, 2021                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*