UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ALEJANDRO HANDAL and DONALD
DOMINIQUE, Individually and on Behalf of
All Others Similarly Situated,

                    Plaintiffs,

          - against –

TENET FINTECH GROUP INC. F/K/A Peak
FINTECH GROUP INC., JOHNSON JOSEPH,
and JEAN LANDREVILLE,

                    Defendants.
--------------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-6461 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

       Lead Plaintiff Alejandro Handal and named Plaintiff Donald Dominique (collectively, "Plaintiffs"), on behalf of a putative class, bring this action against Defendants Tenet Fintech Group Inc., f/k/a Peak Fintech Group Inc. ("Tenet"), Tenet Chief Executive Officer Johnson Joseph ("Joseph"), and Tenet Chief Financial Officer Jean Landreville ("Landreville") (collectively, "Defendants") based on alleged violations of the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act").  Plaintiffs' Amended Complaint alleges that: (1) Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k ("Count One"); (2) Joseph and Landreville violated Section 15 of the Securities Act, 15 U.S.C. § 77o ("Count Two"); (3) Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), 17 CFR § 240.10b-5 ("Count Three"); and (4) Joseph and Landreville violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t ("Count Four").  Defendants have moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the Court grants the motion to dismiss

in part and denies it in part.

## BACKGROUND

I.      **Relevant Facts[1]**

A.  **Registration of Defendants' Common Stock on the Nasdaq and Subsequent Suspension of Trading**

Tenet is a Canadian company operating primarily in China, that "operates as an IT portfolio management company." (Am. Compl., Dkt. 25 (hereinafter "Dkt. 25"), ¶¶ 2, 28.) Tenet's common stock began trading on the Canadian Stock Exchange on October 23, 2015 under the ticker symbol "PKK." (*Id.* ¶ 21.) Tenet's common stock has also been available for purchase on the over-the-counter (OTC) markets "OTCQB" and "OTCQX" (hereinafter referred to generally as "OTC markets")—which enables securities to be traded "between brokers and dealers who negotiate directly" and is "not an organized securities exchange"[2]—at various times, including from October 2015 to September 8, 2021. (*Id.* ¶¶ 4, 21; *see also* Defs.' Mot. To Dismiss, Dkt. 33-1 (hereinafter "Dkt. 33-1"), at 3.) In 2021, Defendants made plans to have their stock listed on a standard market exchange in the United States and used a Form 40-F, a form for companies incorporated in Canada,[3] to register Tenet's common stock in the United States. (*Id.* ¶¶ 2, 28.) Defendants' Form

---

[1] The Court accepts as true all factual allegations in the Amended Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true[.]") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[2] *See In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, No. 20-CV-3135 (LAK), 2021 WL 3863372, at *3 (S.D.N.Y. Aug. 30, 2021) (quoting Black's Law Dictionary 1331 (11th ed, 2019)).

[3] Form 40–F is used to "register securities" with the Securities and Exchange Commission "pursuant to section 12(b) or 12(g) of the Exchange Act" and can be used if "(1) [t]he registrant is incorporated or organized under the laws of Canada or any Canadian province or territory; (2) [t]he registrant is a foreign private issuer or a crown corporation; (3) [t]he registrant has been subject to the periodic reporting requirements of any securities commission or equivalent regulatory authority in Canada for a period of at least 12 calendar months immediately preceding the filing

40-F Registration Statement ("Registration Statement") was filed with the Securities and Exchange Commission ("SEC") on September 3, 2021, seeking to have Tenet's securities listed on the Nasdaq Stock Market ("Nasdaq").  (*Id.* ¶¶ 2, 3.)  Defendants then issued a press release on September 7, 2021 noting that "the Nasdaq Stock Market LLC ha[d] approved the listing" of the company's common stock, and that such stock would begin trading on the Nasdaq under ticker symbol "TNT" on Thursday, September 9, 2021.  (*Id.* ¶¶ 4, 21.)  In a September 8, 2021 letter to the SEC, Nasdaq's Vice President ("VP") of Listing Qualifications, Eun Ag Choi, wrote to convey Nasdaq's approval for the listing and registering of Defendants' securities.  (*Id.* ¶ 3.)  In the letter, Choi wrote, "We understand that the Registrant is seeking immediate acceleration of the effective date of registration, and we hereby join in such request."  (*Id.*)  Consistent with the information in this press release, the "TNT" securities began trading on the Nasdaq on September 9, 2021.  (*Id.* ¶ 21.)

Less than two weeks after Nasdaq VP Choi's letter to the SEC, and the listing of Tenet's securities, trading of the "TNT" securities came to an abrupt halt.  On September 21, 2021, Defendants issued a press release stating that the Nasdaq had advised Defendants that the SEC was "still in the process of reviewing the Company's registration statement" and that, because "the review process [was] taking longer than originally expected, trading of [the securities] on the Nasdaq has been temporarily halted until the SEC completes its review and issues the notice of effectiveness of the Company's Form 40-F."  (*Id.* ¶ 5.)  Nasdaq VP Choi then wrote a second letter to the SEC on September 28, 2021, stating that the Nasdaq "had approved [the securities] for listing

---

of this Form and is currently in compliance with such obligations; and (4) [t]he aggregate market value of the public float of the registrant's outstanding equity shares is $75 million or more."  17 C.F.R. § 249.240f (2012).

and registration upon official notice of issuance," and that the securities began trading on the Nasdaq on September 9, 2021, but that the Nasdaq had "halted trading" of the securities when it became aware that "the Division of Corporation Finance ha[d] not yet accelerated the effective date of the Company's Form 40-F 12(b) registration statement." Therefore, Nasdaq VP Choi wrote, the Nasdaq was withdrawing its "earlier certification of approval." (*Id.* ¶ 7.)

In the window of time between the Nasdaq listing Tenet's securities and then halting their trading due to the SEC's failure to accelerate the effective date of the Registration Statement, Tenet's securities were available for sale on the Nasdaq for approximately eleven days and were purchased by various individuals, including Plaintiffs. (*Id.* ¶ 31.) Lead Plaintiff Handal purchased 72,598 shares of Defendants' stock between September 14, 2021 and September 15, 2021. (*Id.* ¶ 19.) Named Plaintiff Dominique purchased 910 shares of Defendants' stock on September 9, 2021. (*Id.* ¶ 20.)

On September 28, 2021, Defendant Joseph wrote to the SEC on behalf of Defendants requesting that the SEC consent to the withdrawal of their Registration Statement. (*Id.* ¶ 8.) Plaintiffs allege that this withdrawal was due to Defendants' "fail[ure] to comply with the SEC's risk disclosure guidance regarding its Chinese operations." (*Id.* ¶ 9.) On September 29, 2021, the Nasdaq de-listed Defendants' stock and the share price fell 17%. (*Id.*) Tenet's securities currently trade on the OTC markets in the United States under the ticker symbol "PKKFF." (*Id.* ¶ 21.)

**B.  Defendants' Alleged Misstatements**

In the wake of the Nasdaq listing and de-listing, on October 4, 2021, market analyst "Grizzly Research" published a report (the "Grizzly Report") asserting that Tenet had engaged in "questionable" business practices and identifying three examples of Tenet's disclosures about corporate transactions that Grizzly Research alleged were false. (*See generally* Dkt. 25-2.) The

4

Grizzly Report contained footers on nearly every page indicating that the authors of the report had a "direct or indirect short position in the stock (and/or options, swaps, and other derivatives related to one or more of these securities) of the company covered" in the report and therefore stood to "realize significant gains in the event that the price of PKK's stock decline[d]." (*See, e.g.*, Dkt. 25-2, at ECF 2, 4–24.)[4]  Plaintiffs rely on the three corporate transaction examples in the Grizzly Report as the basis for their complaint, alleging that the information disclosed about these transactions in the Registration Statement, as well as subsequent statements made by Joseph about these transactions, were material misrepresentations and omissions in violation of the securities laws. (Dkt. 25, ¶ 123, *see also* Dkt. 25-2, at ECF 2.)  When the Grizzly Report was published, Tenet's stock price fell again, this time by 17.47%.[5]  (Dkt. 25, ¶ 123.)  The following day, Joseph participated in a question-and-answer session ("the Q&A") with StockFam, an investor platform, refuting the Grizzly Report's findings, and Tenet's stock price rose by 23.1%.  (*Id.* ¶¶ 38, 124.)  Plaintiffs allege that the Q&A was "rife with materially false and misleading statements."  (*Id.*)  On October 13, 2021, "Grizzly Research" published a rebuttal report ("Rebuttal Report") which again took aim at the three problematic statements identified in the original Grizzly Report.  (*Id.*)  Once the Rebuttal Report was published, Tenets' share price fell 6%.  (*Id.*)

The three allegedly false statements by Defendants identified in the Grizzly Report are: (1) Tenet was in the process of acquiring a 70% equity stake in the company Jinxiaoer (*Id.* ¶¶ 35, 94); (2) Tenet was going to acquire a 51% stake in the company Asia Synergy Financial Capital ("ASFC") for $10.2 million Canadian (*Id.* ¶¶ 43, 101); and (3) Tenet had acquired the assets of

---

[4]  Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

[5]  By this time, though Tenet's securities had been withdrawn from the Nasdaq, they continued to be traded on the OTC markets.  (*Id.* ¶ 9.)

Beijing company Huayan Kun Thai Technology Company Ltd. ("Huayan"), which primarily operated an insurance product called Heartbeat (*Id.* ¶ 83).

### 1.    Jinxiaoer Acquisition

Plaintiffs allege that Defendants' Registration Statement falsely stated that Defendants had acquired a 70% equity interest in Jinxiaoer, a Chinese company operating a popular financial lending application ("Jinxiaoer Platform").  (*Id.* ¶ 10.)  According to an announcement made by Tenet in December 2019, Defendants agreed to pay $600,000 in cash and $800,000 in Tenet's common stock over 18 months for this 70% stake in Jinxiaoer.  (*Id.* ¶ 93.)

Tenet never acquired an equity interest in Jinxiaoer or the Jinxiaoer Platform.  (*Id.* ¶ 10.) Certain corporate records show that six entities own Jinxiaoer, none of which is Tenet or any of Tenet's subsidiaries.  (*Id.* ¶¶ 41, 99.)  Additionally, a search of publicly available records shows that the Jinxiaoer Platform is still owned by Jinxiaoer and not Tenet.  (*Id.* ¶¶ 42, 100.)   In disclaiming the Grizzly Report's accusations, Joseph indicated in the Q&A that Tenet was interested in Jinxiaoer's assets as opposed to equity: "When [Tenet] acquired Jinxiaoer's assets, the plan was to roll everything over into a new subsidiary.  But [Tenet] eventually decided that it would be best to revamp the software and the business model to better fit into our Business Hub. So right now, we're using Jinxiaoer's technology, but not through a standalone subsidiary." (*Id.* ¶¶ 38, 117.)  Plaintiffs allege that Joseph's statement was untrue when he made it.  (*Id.* ¶ 118.)

### 2.    Ownership of ASFC

Plaintiffs allege that Defendants' Registration Statement falsely stated that the company ASFC was "one of [Tenet's] key subsidiaries," and falsely listed its ownership of ASFC at 51%. (*Id.* ¶¶ 44, 102.)  The Grizzly Report asserted that Tenet never owned ASFC and that the company is instead owned by two other companies and three individuals, none of which seem to have a

connection to Tenet. (*Id.* ¶ 45.) To rebut this claim, Joseph told investors in the Q&A that the two company shareholders and two of the three individual shareholders of ASFC held 51% of the company on Tenet's behalf pursuant to a nominee shareholder agreement. (*Id.* ¶¶ 46, 104.) Joseph also stated that the Report's author could have verified this arrangement "with a minimum amount of research." (*Id.*)[6] However, based on a public database research of ASFC's owners, no combination of the reported ownership percentages of the five entities—the two corporate shareholders and the three individual shareholders—adds up to 51%. (*Id.* ¶¶ 49–52; 107–10.)

### 3. Huayan Acquisition

On September 14, 2021, during the brief period when Tenet's securities were trading on the Nasdaq, Tenet announced that it had acquired the assets of Huayan, a Chinese company providing software services through its proprietary "Heartbeat" insurance product management and brokerage platform. (*Id.* ¶ 83.) Specifically, Defendants stated that Huayan's employees and operations would be transferred to Tenet's subsidiary Xinxiang Technologies Ltd. (*Id.*) Plaintiffs allege that this statement was false because Huayan did not and does not actually own the Heartbeat platform. (*Id.* ¶¶ 84–85.) Instead, a third-party company called Beijing Huike Hulian Technology Ltd. ("Huike"), owned by an individual named Kai Cui, solely owns the Heartbeat platform as evidenced by Huike filing annual reports and a trademark application for the Heartbeat product. (*Id.* ¶ 85.)

In the Q&A, Joseph denied that its claim about purchasing the Heartbeat platform was false by saying, "Huayan and Huike are affiliated companies owned by the same people and that's who our transaction is with." (*Id.* ¶ 86.) He then went on to explain that Defendants had asked Huayan

---

6    The Amended Complaint characterizes this statement as "paradoxical," given Defendants' "admitted effort of hiding such clandestine arrangement—if it even existed." (*Id.*)

to transfer "all its IP, including the Heartbeat platform" to Huike as a way of isolating the assets to be acquired until the deal was finalized, but that Huayan had indeed been the "operating company leveraging the Heartbeat platform until this year." (*Id.*)  The Rebuttal Report disputed the truth of that statement, alleging that Huayan had never owned or operated Heartbeat, let alone . . . transferred Heartbeat to Huike.  (*Id.* ¶ 87.)  Plaintiffs' own research shows that there is no overlap in the IP rights and assets owned by Huike and Huayan, which, Plaintiff alleges, supports the inference that Huayan never transferred any IP rights to Huike.  (*Id.* ¶ 90.)  At the time the Amended Complaint was filed, Huike still owned Heartbeat and no acquisition of Heartbeat or Huayan's assets had been made by Defendants.  (*Id.* ¶ 92.)

## II.    Procedural History

Plaintiffs filed their initial complaint on November 19, 2021.  (Dkt. 1.)  Thereafter, three putative class members filed motions to be appointed as lead plaintiff along with their lawyers to be appointed as lead counsel.  (*See* Dkts. 5, 8, 10.)  Subsequently, two of the three motions were withdrawn and Lead Plaintiff Handal's motion to be appointed lead plaintiff was granted.  (Dkt. 17.)  The Rosen Law Group was appointed as lead counsel by the same order.  (*Id.*)  On February 22, 2022, the Court approved a joint stipulation by the parties that extended Plaintiffs' time to amend their complaint to April 11, 2022.  (*See* 2/22/2022 Docket Order.)  Plaintiffs filed the Amended Complaint by that deadline.  (Dkt. 25.)  On June 10, 2022, Defendants requested a pre-motion conference in anticipation of filing a motion to dismiss Plaintiffs' claims.  (Dkt. 26.)  Plaintiffs responded to this request for a pre-motion conference on June 24, 2022.  (Dkt. 27.)  The Court denied Defendants' pre-motion conference request as unnecessary and allowed the Defendants to move forward with their motion to dismiss.  (*See* 6/25/2023 Docket Order.)  The instant motion to dismiss was fully briefed on October 24, 2022.

**LEGAL STANDARD**

To withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Spira v. Aeroflot-Russian Airlines*, 552 F. Supp. 3d 418, 422 (E.D.N.Y. 2021) (ultimately citing *Twombly*, 550 U.S. at 570 (quotations omitted)). "The plausibility standard does not require detailed factual allegations, but it demands more than unadorned, the-defendant-unlawfully-harmed-me accusations." *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 175 (E.D.N.Y. 2019) (citing *Iqbal*, 556 U.S. at 678 (cleaned up)). A complaint must contain sufficient "factual content," generally accepted as true, to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554 F. Supp. 3d 448, 457 (E.D.N.Y. 2021) (quoting *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011)). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000).

**DISCUSSION**

I.     **Securities Act Claims**

A.  **Count One: Violation of Section 11 of the Securities Act, 15 U.S.C. § 77k**

The Court will first address Defendants' motion to dismiss Count One of the Amended Complaint, which alleges that Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, by making materially misleading statements in their September 3, 2021 Registration Statement used to list Tenet stocks on the Nasdaq.

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC*." In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  The relevant statutory provision provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security. . . may, either at law or in equity, in any court of competent jurisdiction, sue[.]

15 U.S.C.  § 77k(a).  "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley*, 592 F.3d at 358–59 (*quoting* 15 U.S.C. § 77k(a)).

In contrast to claims brought under Section 10(b) of the Exchange Act, which the Court discusses further *infra*, claims brought under Section 11 of the Securities Act do not need to allege scienter, reliance, or loss causation.  *Id.* at 359.  In order to assert a Section 11 claim, however, Plaintiffs must be able to "trace their shares to an allegedly misleading registration statement." *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003)).  "At least one named plaintiff must be a member of that class—that is, a named plaintiff must have purchased shares traceable to the challenged offering." *In re Glob. Crossing*, 313 F. Supp. 2d at 207.

10

1.     <u>Section 11's Applicability to Securities Offered Through Form 40-F</u>

Defendants' threshold argument is that the Form 40-F that Defendants used to register their securities on the Nasdaq—which is used by Canadian companies or foreign private issuers to register their stocks in U.S. exchanges—is not subject to Section 11 of the Securities Act because it is not a "registration statement" as contemplated by the statute.  (Dkt. 33-1, at 7–8.)  Defendants' argument has no basis in either the letter or spirit of the securities laws, and therefore fails.

Section 11 of the Securities Act refers simply to a "registration statement," 15 U.S.C. § 77k(a), and the definition of "registration statement" is simply "the statement provided for in section 77f of this title, and includes *any* amendment thereto and any report, document, or memorandum filed as part of such statement or incorporated therein by reference."  15 U.S.C. § 77b(a)(8).  Section 77f, in turn, provides for the method of registering securities.  *See* 15 U.S.C. § 77f.  Instead of being narrowly defined, as Defendants argue, a registration statement is *any* document that is the means of registering securities.  The statutory language provides for a wide range of documents to be considered "registration statements," and the Court finds no basis for artificially narrowing this term to conform to Defendants' interpretation.

Notwithstanding the statute's broad language, this case does not present a close call.  By Form 40-F's own terms, the form can be used as a "registration statement pursuant to Section 12 of the Exchange [Act]" or an "annual report pursuant to Section 13(a) or 15(d) of the Securities [Act]."  (Def's. Form 40-F, Dkt. 33-3 (hereinafter "Dkt. 33-3"), at ECF 2.)  Defendants elected the former option, using their Form 40-F to "register"[7] their common shares for trading on the Nasdaq

_____

[7]  Defendants consistently use the term "list" instead of "register" as part of their argument that the action of holding out their common stock for sale on the Nasdaq was not an "offer" of securities as contemplated by Section 11's text.  (*See, e.g.*, Def's. Reply, Dkt. 36 (hereinafter "Dkt. 36"), at 1 n.2.)  The Court declines to adopt this artificial semantic distinction and uses 'offer' and

"pursuant to Section 12(b) of the Exchange Act."[8]  (*Id.*)  Plaintiffs point to the form's wording as a "registration statement" and also to the form's instructions to argue that the Form 40-F was indeed a registration statement for purposes of Section 11 liability.  (Pl's. Opp'n, Dkt. 34 (hereinafter "Dkt. 34"), at 1, 7.)  Even Defendants refer to the Registration Statement as just that— a registration statement—in their September 21, 2021 press release, in which they stated that the SEC was "still in the process of reviewing the Company's *registration statement*, known as Form 40-F[.]"  (Dkt. 25, ¶ 54 (emphasis added).)  Additionally, Plaintiffs point to an instruction on Form 40-F that specifically carves out a safe harbor protection from Section 11 liability, indicating that Section 11 otherwise applies to the form.  (Dkt. 34, at 7; *see also* Form 40-F, at 8, (d)(1).)  Plaintiffs cite to *Carmack v. Amaya Inc.*, in which the district court rejected an argument similar to Defendants' registration of their securities made via a Form 40-F as a registration statement for purposes of Section 11 liability.  *See* 258 F. Supp. 3d 454, 461 (D.N.J. 2017) ("[Defendant] filed its Registration Statement pursuant to Section 12 of the Exchange Act . . . on SEC Form 40-F in order to become a reporting company under the Act.").  In *Carmack*, the defendant Canadian company used a Form 40-F as a registration statement to list its common stock on the Nasdaq, exactly as Defendants have done here, and the plaintiffs in that action sued the defendants under

---

"list" interchangeably because the Court finds that these terms convey the same meaning in this context.

[8]   Section 12(b) of the Exchange Act provides, in relevant part: "A security may be registered on a national securities exchange by the issuer filing an application with the exchange . . . which application shall contain . . . [s]uch information, in such detail, as to the issuer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer . . . as the Commission may by rules and regulations require[.]" 15 U.S.C. § 78l(b).

Section 11 for making materially inaccurate statements in their Form 40-F registration statement.[9] Am. Compl. ¶¶ 55, 109, *Carmack*, No. 16-CV-1884 (D.N.J. Aug. 31, 2016).  The *Carmack* court found the Section 11 claim adequately pleaded and it thus survived the motion to dismiss. *Carmack*, 258 F. Supp. 3d at 469.  The Court sees no reason to hold differently here.

Indeed, the Court assumes that there is limited caselaw on whether statements in a Form 40-F can give rise to Section 11 liability for at least two reasons.  First, it seems axiomatic that a Form 40-F is a "registration statement."  Second, to find otherwise would be troubling from a policy perspective.  Allowing foreign companies to skirt Section 11 liability by registering their securities in the United States via Form 40-F would undermine an important guardrail that protects the trading public from false statements in registration statements.

Therefore, the Court finds that a registration statement made via Form 40-F is subject to Section 11 liability.

### 2.    Whether the Form 40-F Registration Statement Became Effective

Defendants' second line of argument is that even if the Form 40-F is subject to Section 11, the Registration Statement never became "effective" within the meaning of that term as it appears in the statute.  (Dkt. 33-1, at 11–12.)

The timeline at issue in this case does appear to be unique with respect to the question of effectiveness.   According to the sequence laid out in the Amended Complaint, Defendants'

---

[9]  In their reply, Defendants argue that *Carmack* is distinguishable because in that case, the defendants filed both a Form 40-F and a Form F-10 and that the registration statement referred to in the pleadings and incorporated into the Section 11 claim was the Form F-10.  (Dkt. 36, at 2.) Defendants are partially correct, but the Form 40-F registration statement was eventually incorporated into the Form F-10, so in *Carmack*, the two forms became one in the same.  *Carmack*, Dkt. 36, ¶ 64 ("The [Form F-10] November Registration Statement incorporated the [Form 40-F] May Registration Statement by reference . . . [t]he statements therein were therefore misleading for the same reasons the May Registration Statement was misleading[.]").

common stock traded on the Nasdaq absent SEC approval and those stocks were available to the purchasing public for approximately eleven days before trading was halted and Defendants withdrew the Registration Statement.  According to Nasdaq guidance, "Listing can commence only upon effectiveness of the security's registration pursuant to Section 12(d)."  *See* Nasdaq Procedure 5210(f);[10] *see also* 15 U.S.C. § 77e(a)(1) ("Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly to . . . sell such security[.]".)  Despite rules to the contrary, the Nasdaq listed Defendants' securities, presumably under the assumption that the SEC would accelerate the effectiveness of Defendants' Registration Statement.[11]

In the absence of clear caselaw regarding what constitutes "effective" registration under Section 11, the Court again applies common sense and takes into consideration Section 11's purpose.  If the purchasing public was able to actually buy Defendants' stock on the Nasdaq, which was only listed there on the basis of the Registration Statement, the securities laws—including Section 11's requirement that all representations in a registration statement be truthful—apply, even in the absence of the SEC's seal of effectiveness.[12]  To find otherwise would penalize

---

[10] The Court takes judicial notice of this Nasdaq guidance, which is available at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-5200-series.

[11] The Court can only speculate that there was some miscommunication that led the Nasdaq to clear Tenet's stock for trading without the necessary SEC approval, but the Court need not resolve that question.  For their part, the parties do not provide any context for this seemingly aberrant set of events other than Defendants stating that the Nasdaq "prematurely listed" the securities, seemingly contrary to its own rules.  (Dkt. 36, at 3.)

[12] Defendants mock Plaintiffs' argument that the Registration Statement was effective since they bought the shares as "gibberish."  (Dkt. 36, at 2.)  Quite the opposite.  It makes inherent sense that where individuals were able to, and did, purchase actual securities listed on the Nasdaq, the registration statement that led to the posting of those securities should be deemed effective, and that the purchasers can avail themselves of the protections of the securities laws.  While Defendants readily accept the fact that Plaintiffs were able to purchase their securities, they argue,

purchasers of securities that were actively traded on the Nasdaq for over a week in reliance on a listing they had no reason to doubt.  The Court therefore finds that the Registration Statement was effective for purposes of Section 11 liability.

        3.      <u>Traceability</u>

Defendants next argue that Plaintiffs are not able to trace their shares to the Registration Statement and thus lack standing to bring a Section 11 claim.  (Dkt. 33-1, at 10–11.)

"To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading."  *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023).  These securities cannot simply "bear some sort of minimal relationship to a defective registration statement," but must be "registered under the particular registration statement alleged to contain a falsehood or misleading omission."  *Id.* at 767.  Plaintiffs have met the traceability prong.

Defendants argue that "[e]ven if the Form 40-F could be considered an effective '33 Act registration statement," Plaintiffs could not trace their purchase of Tenet shares to it "because every share of Tenet stock was already listed and trading in the market prior to the filing of the Form 40-F."  (Dkt. 33-1, at 10.)  Put another way, Defendants argue that because Tenet's common stock was technically available on the OTC markets before they traded on the Nasdaq, Plaintiffs cannot prove that their purchase of the securities was the product of the Registration Statement that brought Tenet's common stock onto the Nasdaq.  However, as Plaintiffs point out, this argument ignores the fact that once Tenet's securities began trading on the Nasdaq, they ceased being traded on the OTC markets and were thus available for purchase *only* on the Nasdaq.  (Dkt. 34, at 7; *see*

---

as a defense to refunding those purchases, that the "Nasdaq listed Tenet's shares prematurely." However, the premature offering did not render these securities any less purchasable.

*also* Dkt. 25, ¶ 4 (stating that Tenet's common stock would continue to trade on the OTC markets "*until* market close on Wednesday, September 8, 2021.") (emphasis added).)  Therefore, but for the Registration Statement, Tenet's shares would not have been traded on the Nasdaq from approximately September 9, 2021 to September 21, 2021 and Plaintiffs would not have purchased them on September 9, 14, and 15, 2021 (Dkt. 25, ¶¶ 19, 20)—which means that Plaintiffs *can* trace their shares to Defendants' allegedly fraudulent Registration Statement.[13]

> ### 4.   Plaintiffs Have Sufficiently Pleaded a Section 11 Claim Under Rule 9(b)

Now that the Court has determined that Section 11 applies to the facts of this case, and that Plaintiffs have standing to bring a Section 11 claim, the Court must decide whether Plaintiffs are subject to the heightened pleading requirements of Rule 9(b) for their Section 11 allegations or whether the lesser pleading standards of Rule 8 apply.  *Compare* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.") *with* Fed. R. Civ. P. 8(a) (providing that pleading must contain a "short and plain statement" of claim showing pleader's entitlement to relief).  For the reasons below, the Court applies Rule 9(b) and finds that Plaintiffs have alleged a Section 11 claim with sufficient particularity.

In assessing Section 11 claims, courts must determine whether a plaintiff's allegations are "premised on fraud, or merely on negligence."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* ("*UBS*"), 752 F.3d 173, 183 (2d Cir. 2014) (internal citation and quotations omitted).

---

[13]  Accordingly, Defendants' statute of repose defense, arguing that because Tenet's common stock was first "offered" in 2015 on the OTC markets, Plaintiffs' Section 11 claim is time barred (Dkt. 33-1, at 11), is unavailing because Plaintiffs can trace their shares to the September 3, 2021 Registration Statement.  As this lawsuit was filed on November 19, 2021, this action was brought well within Section 11's three-year statute of repose, which requires that Section 11 claims be brought within three years of the securities' offering.  *See* 15 U.S.C. § 77m.

When the claims "sound in fraud" and are "identical" to a plaintiff's Section 10(b) claims, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Id.*

In an effort to have the Court apply Rule 8's lesser pleading standards, Plaintiffs add a footnote to the heading in their Amended Complaint titled, "Substantive Allegations Under Securities Act," that states, "Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under the Securities Act." (Dkt. 25, at 9 n.1.) Defendants respond that this footnote is not enough to allow the Court to simply apply Rule 8(b). (Dkt. 33-1, at 12.)  Plaintiffs argue in opposition that Rule 8(b) applies because their "Securities Act and Exchange Act claims are separate." (Dkt. 34, at 14.)  The Court, however, finds that simply because Plaintiffs took "the trouble to separate their claims into separate sections," does not mean that the Court must similarly cabin their Securities Act and Exchange Act claims and apply two distinct pleading standards. *Lighthouse Fin. Grp. v. Royall Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 338–39 (S.D.N.Y. 2012) (applying Rule 9(b) despite plaintiffs' claims being separately pleaded), *aff'd sub nom. IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).

Plaintiffs also ask the Court to compare the allegations in the Securities Act section of the Amended Complaint with their Exchange Act allegations in the Amended Complaint to argue that the claims are not "nearly identical," as Defendants argue.  (Dkt. 34, at 14.)  An examination of the allegations in the Amended Complaint, however, leads the Court to conclude that the allegations in both sections of this document are "substantively identical."  *UBS*, 752 F.3d at 183. For example, both sections contain identically worded headings and allege the same core facts giving rise to Plaintiffs' claims.  Plaintiffs' attempt to thread the needle by providing minimally edited articulations of the two sets of claims—all of which rely on the same alleged

misstatements—to create the illusion that the claims are distinct is unavailing.  *Compare* Dkt. 25, ¶ 38 *with* Dkt. 25, ¶ 96.  Indeed, in some instances, Plaintiffs use the exact same language to describe their allegations.  As but one example, under both the Securities Act section and the Exchange Act section of the Amended Complaint, Plaintiffs call the Jinxiaoer deal a "fake transaction."  (Dkt. 25, ¶¶ 37, 95.)

For the Court to apply Rule 8's more liberal pleading standards to Plaintiffs' Section 11 claim, the Court would need to find that Plaintiffs' Section 11 claims plead "at most negligence." *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017).  But Plaintiffs allege more than mere negligence in their Section 11 claims; they suggest knowing and intentional deception and fraud.  For example, in explaining Joseph's Q&A response to the Grizzly Report's statements on Defendant's ownership of ASFC, Plaintiffs state:

> Joseph explained, without any supporting documents, that the two company shareholders of ASFC and two of the three ASFC individual shareholders secretly hold 51% ownership on Tenet's behalf pursuant to a nominee shareholder agreement to circumvent Chinese regulatory restrictions.  Paradoxically, Joseph claimed that Grizzly could have "easily verified [such nominee shareholder arrangement] with a minimum amount of research" *despite [Defendant's] admitted effort of hiding such clandestine arrangement*—if it even existed.

(Dkt. 25, ¶ 46 (emphasis added, bracket in original).)  The language of this paragraph, coupled with allegations of false statements throughout the Securities Act section of the Amended Complaint (referencing "untrue statements," and "false and misleading" statements) lead the Court to conclude that this is not a case where Plaintiffs have relied on a theory of negligence for their Securities Act claims.[14]  Therefore, because Plaintiffs Section 11 claims are "premised on

---

[14] Plaintiffs point the Court to the decision in *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161 (E.D.N.Y. 2017) to argue that, as in *Altayyar*, Rule 8 should be applied.  (Dkt. 34, at 14 n.26.)  In that case, the court found that Plaintiff had used phrases "evocative of negligence," such as "through the exercise of reasonable diligence," "duty to make a reasonable and diligent investigation of the statements," and "exercise reasonable care." *Id.* at 185.  While, here, Plaintiffs

allegations of fraud," the Court holds Plaintiffs to the Rule 9(b) standard.  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

But even applying Rule 9(b), the Court finds that Plaintiffs have alleged their Section 11 claim with sufficient particularity.  First, the Amended Complaint clearly identifies the three alleged misstatements that were incorporated into the Registration Statement that form the basis of their Section 11 claim: (1) Defendants' certification statement that the Registration Statement "meets all of the requirements for filing a Form 40-F" (Dkt. 25, ¶ 53); (2) Exhibit 99.172, incorporated into the Registration Statement, which stated that Tenet acquired a "70% equity stake in Jinxiaoer" (*Id.* ¶ 55); and (3) Exhibits 99.241 and 99.240, incorporated into the Registration Statement, which listed ASFC as one of Tenet's key subsidiaries and represented that Tenet owned 51% of that company (*id.* ¶ 57).  Each of these categories of alleged misstatements is accompanied by specific reasons as to why Plaintiffs believe these statements were false and misleading.  (*Id.*, ¶¶ 54, 56, 58.)  Therefore, the Court finds that this is sufficient information to satisfy Rule 9(b)'s heightened pleading requirement and puts Defendants on fair notice of Plaintiffs' securities fraud claims.  *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 215 (S.D.N.Y. 2004) (holding securities fraud plaintiffs to 9(b) standard despite a disclaimer in their complaint, and finding that they met the higher pleading standard).  "[T]o hold otherwise would require securities plaintiffs to produce information at the pleading stage to which they have no access

---

similarly use the phrase "duty bound" (Dkt. 25, ¶ 10) and "exercise of reasonable diligence" (*Id.* ¶ 73) in an apparent attempt to state a negligence theory, these nominal efforts are unconvincing where "the gravamen of the complaint is plainly fraud."  *See In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 225 (quoting *Rombach*, 355 F.3d at 172) (finding Rule 9(b) applied to Section 11 claims even where plaintiffs "insert the classic language of negligence pleading in their Section 11 claim.").

because of the [Private Securities Litigation Reform Act's ("PSLRA")] mandatory discovery stay." *Id.*

*       *       *

Therefore, Defendants' motion to dismiss Count One of the Amended Complaint is denied.

## B. Count Two: Violations of Section 15 of the Securities Act - Control Person Liability

In Count Two of the Amended Complaint, Plaintiffs allege that Defendant Joseph, Tenet's CEO, and Defendant Landreville, Tenet's CFO, violated Section 15 of the Securities Act, which establishes control person liability for violations of Section 11. To establish Section 15 liability, a plaintiff must show: (1) a "primary violation" of Section 11; and (2) control of the primary violator by the defendants. *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 206–07 (2d Cir. 2009); *see also Morgan Stanley*, 592 F.3d at 358. Moreover, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

As discussed, Plaintiffs have stated a claim for a Section 11 primary violation, so they need only to sufficiently allege control as to Defendants Joseph and Landreville to state a claim under Section 15. "Control is defined as 'the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise.'" *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 427 (S.D.N.Y. 2020) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996)). "The power to influence managerial decisions is not the same as 'power to direct the management and policies of the primary violator.'" *Id.* at 428 (quoting *In re Tronox,*

20

*Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011)).  "Actual control" is essential to establishing control person liability.  *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997).

Joseph signed the Registration Statement.  (Dkt. 33-3, at ECF 6.)  At the pleading stage, this is sufficient to make out a Section 15 control claim against him.  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (holding that allegations that individual defendants were officers and signed the registration statements at issue sufficient to "satisfy Plaintiffs' obligation to plead control").

The analysis is more complicated when it comes to Landreville, as his signature does *not* appear on the Registration Statement.  Plaintiffs allege that both Joseph and Landreville were "in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement."  (Dkt. 25, ¶ 76.)  And while Landreville is Tenet's CFO, officer status by itself, is insufficient to plead control.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) ("[S]tatus as officer or committee member is generally not enough to constitute control[.]").  Because Landreville did not sign the Registration Statement and the Amended Complaint contains nothing more than boilerplate allegations to establish that Landreville was a control person of Tenet at the time of the Registration Statement's publication, the Court finds that, at this stage, Plaintiffs have not sufficiently alleged a Section 15 control claim as to him.  *See In re Glob. Crossing*, 2005 WL 1875445, at *3 ("Conclusory allegations of control are insufficient as a matter of law."); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) (dismissing Section 15 claim as to two individual defendant officers who did not sign the registration statement at issue and because plaintiffs insufficiently pleaded that these individuals controlled the defendant company).

\*   \*   \*

In sum, the Court finds that Plaintiffs have sufficiently alleged a violation of Section 11, and a violation of Section 15, but only as to Joseph.  Therefore, Defendants' motion to dismiss Count Two of the Amended Complaint is denied as to Joseph and granted as to Landreville.

## II.   Exchange Act Claims

### A.   Count Three: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 – Misstatements and Omissions Concerning Business Ownership

In Count Three of the Amended Complaint, Plaintiffs claim that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for misstatements and omissions concerning the three business transactions discussed *infra* (*see* Background Section I.B.1–3).  (*See* Dkt. 25, ¶¶ 111–22; 135–44.)

#### 1.   Section 10(b) and Rule 10b-5 Standard

Section 10(b) of the Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—. . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5 further explains that "any manipulative or deceptive contrivance" includes the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To survive a motion to dismiss under Section 10(b) of the Exchange Act, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.* ("*ATSI*"), 493 F.3d 87, 105 (2d Cir. 2007); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). As discussed, claims of securities fraud are subject to a heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure, such that a party must "state *with particularity* the circumstances constituting fraud . . . ." (emphasis added); *see also ATSI*, 493 F.3d at 99. In the context of a 10(b) claim, the Second Circuit has interpreted Rule 9(b) to require that a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted)).

Moreover, under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2)(A); *see also ATSI*, 493 F.3d at 99. "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Any allegation of conscious misbehavior or recklessness should be "viewed holistically and together with the allegations of motive and opportunity" to determine whether the complaint supports a strong inference of scienter. *Set Cap. LLC v. Credit Suisse Gr. AG*, 996 F.3d 64, 78 (2d Cir. 2021).

23

Although "the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007); *see also In re Advanced Battery Tech. Sec. Litig.*, 781 F.3d 638, 644 (2d Cir. 2015); *ECA*, 553 F.3d at 198.

2.    Application

Defendants argue that Plaintiffs have failed to sufficiently allege that Defendants: (1) made material misstatements; (2) acted with scienter; and (3) that Plaintiffs' reliance on these statements was the proximate cause of their injury.  (Dkt. 33-1, at 14–24.)  The Court finds that Plaintiffs have sufficiently pleaded material misstatements, have sufficiently pleaded scienter as to *some* of the alleged misstatements, and have not adequately pleaded reliance.

Defendants attempt to circumvent any consideration of the fraud-related allegations in the Amended Complaint by arguing that the Court cannot rely on the "untranslated Chinese language exhibits submitted with the Amended Complaint."  (*Id.* at 15.)  As support for this proposition, Defendants cite to a series of in-circuit decisions where courts have deemed documents unaccompanied by certified translations inadmissible, in contexts other than motions to dismiss. (*Id.*)[15]  The Court is unpersuaded by this argument and will consider the documents that are

---

[15] Defendants' reference to *In re Advanced Battery Tech. Sec. Litig.* to support their argument is a red herring.  In that case, the court declined to consider a foreign-language screenshot, accompanied by an uncertified translation, that was attached by the *defendants* to their motion to dismiss, reasoning that the screenshot was "not incorporated into or fairly comprehended by the Complaint and because [the plaintiffs] did not rely on them in bringing their lawsuit."  2012 WL 3758085, at *8 (S.D.N.Y. Aug. 29, 2012).  Here, the materials at issue were attached and relied upon by Plaintiffs in their Amended Complaint, not documents relied upon by Defendants in their motion to dismiss.

incorporated into the Amended Complaint at this stage of the litigation.  *See Tellabs*, 551 U.S. at 322.

Defendants also suggest that the Court should not consider the Grizzly Report and the Rebuttal Report because they are the publications of a short seller and thus unreliable.  (Dkt. 33-1, at 17.)  Other courts in this circuit have rejected this argument, and the Court similarly rejects that argument here because the truth or accuracy of the Grizzly Reports are factual disputes not appropriate for resolution at this stage.  *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (considering a short seller report in denying defendant company's motion to dismiss).   Therefore, at this stage of the proceedings, the Court accepts as true the factual allegations contained in the Grizzly Report and Rebuttal Report upon which Plaintiffs rely in the Amended Complaint.  *See Bernstein v. Seeman,* 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009) ("[A] motion to dismiss is not the proper stage at which to resolve factual disputes.").

a.   Material Misstatements[16]

Plaintiffs identify six allegedly material misstatements corresponding to Count Three of their Amended Complaint—two statements relating to the Jinxiaoer acquisition, two statements related to Tenet's ownership of ASFC, and two statements related to the acquisition of the Heartbeat platform from the Huayan company.

---

[16] Defendants do not dispute the materiality of these alleged misstatements, so the Court does not delve into the materiality analysis.  However, the Court does deem these alleged misstatements "material" because of the "substantial likelihood that a reasonable shareholder" would consider the statements on important acquisition deals to be important with respect to Tenet's value and financial health.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).

First, Plaintiffs identify as false Defendants' inclusion of information about Tenet's acquisition of the Jinxiaoer platform via Exhibit 99.172 to their September 3, 2021 Registration Statement.  That information includes the statement that Tenet was going to acquire[17] a "70% equity stake in Jinxiaoer," and the status update that Tenet "decided to revise Jinxiaoer's revenue model" and that it "spent a large portion of the [fourth] quarter on the development and implementation of features to better meet its clients' needs and [had] discussed the best ways to integrate the Jinxiaoer loan brokerage platform into the Lending Hub."  (Dkt. 25, ¶ 115.) Additionally, Plaintiffs point to the following statement of Joseph in the Q&A as false: "When we acquired Jinxiaoer's assets, the plan was to roll everything into a new subsidiary. [. . .] So right now, we are using Jinxiaoer's technology, but not through a standalone subsidiary."  (*Id.* ¶ 117.) Plaintiffs allege that these two statements regarding Jinxiaoer—(1) the statements made in the September 3, 2021 Registration Statement and (2) the statements made by Joseph in the October 5 Q&A—were materially false and misleading because Tenet did not acquire and does not own the Jinxiaoer platform.  (*Id.* ¶ 118.)

Second, Plaintiffs identify as false Defendants' inclusion of information via Exhibit 99.241 to their Registration Statement about Tenet's alleged equity ownership of ASFC as one of Tenet's "key subsidiaries."  (*Id.* ¶ 119.)   Additionally, Plaintiffs point to another of Joseph's Q&A statements as false: "If you recall, Jiu Dong is the company we partnered with to create ASFC, which owns 49% of ASFC while we own the 51% majority stake. . . .  Because of financial

---

[17] Defendants argue that the statement that Tenet "was to acquire" a 70% stake in Jinxiaoer was a "forward-looking statement" protected by the PSLRA's safe harbor.  (Dkt. 33-1, at 22 n.15.) A closer look at Exhibit 99.172 to the Registration Statement, however, reveals that Jinxiaoer was mentioned not just the one time, but 17 times, and many of these references suggest that Jinxiaoer was already integrated into Tenet's business.  (Dkt. 33-4, at ECF 9, 14, 15.)  Thus, the Court does not apply any forward-looking safe harbor protection to the Jinxiaoer-related statements relied upon by Plaintiffs.

regulations at the time of its creation, we were advised that it would be better to have local Chinese individuals or companies hold our shares in ASFC on our behalf . . . through what's called a nominee shareholder agreement[.]"  (*Id.* ¶ 121.)  Plaintiffs allege that these two statements about ASFC—(1) the statements made in the September 3, 2021 Registration Statement and (2) the statements made by Joseph in the October 5 Q&A—were materially false and misleading because Tenet neither directly nor indirectly owns 51% of ASFC.  (*Id.* ¶ 122.)

Third, Plaintiffs identify as false Defendants' September 14, 2021 press release announcing that it had acquired all of Huayan's assets, including the Heartbeat platform.  (*Id.* ¶ 111.)  Plaintiffs also point to the following Q&A statement by Joseph as false: "Huayan and Huike are affiliated companies owned by the same people[;] . . . we asked Huayan to transfer all its IP, including the Heartbeat platform, to Huike back in March."  (*Id.* ¶ 113.)  Plaintiffs allege that these two statements on Huayan—(1) the statements made in the September 14, 2021 press release and (2) the statements made by Joseph in the October 5 Q&A—were materially false and misleading because Huayan never owned Heartbeat, Huayan actively ran its own business (contrary to the press release's assertion that Huayan's management of its assets was "wind[ing] down" in the lead up to the transfer of these assets to Tenet's subsidiary), the Tenet subsidiary that was purportedly going to receive Huayan's assets is not in operation, and a different company called Huike still owns Heartbeat.  (*Id.* ¶ 112.)

Defendants argue that "Plaintiffs have not presented the corroboration necessary to rely on the Grizzly [R]eports," (Dkt. 33-1, at 19), and caution the Court that it must "closely scrutinize allegations based on short seller reports" because short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate."  (*Id.* at 17 (quoting *Long Miao v. Fanhua, Inc.* ("*Fanhua*"), 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020)).)  Defendants distinguish

this case from those where the complaint is found sufficient because the plaintiffs relied on short-seller reports that were corroborated by their own investigations.   (*Id.* at 19 (citing *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-CV-2700 (PKC), 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (discussing plaintiffs' investigators corroborating the material in a short-seller report that relied on anonymous sources, noting that the investigators set forth their findings "in detail")); *see also In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-CV-214 (HB), 2014 WL 285103, at *2 (S.D.N.Y. Jan. 27, 2014) (plaintiffs' investigators corroborated short-seller report through interviews, photographs, and visits).   Instead, Defendants argue that this case is "on all fours" with *Fanhua*, in which the court dismissed a complaint that relied on a short-seller report that itself was premised exclusively on anonymous sources.   442 F. Supp. 3d at 803–04 (S.D.N.Y. 2020).

To be sure, courts are critical of anonymous sources relied upon in securities fraud complaints, and will "dismiss[] some [complaints] *but generally sustain[] others* where independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers' reports." *Fanhua*, 442 F. Supp. at 801 (emphasis added).   The *Fanhua* court did not sustain the securities fraud complaint at issue because that complaint did "no more than recapitulate the [short-seller report]'s characterization of purported interviews with anonymous sources" and did not "allege any independent corroborative facts, any independent investigation by counsel, *or* any contact by plaintiff's counsel with the interviewees."   *Id.* at 802 (emphasis added).

Here, while it is true that the substance of the Amended Complaint's fraud allegations largely stems from information contained in the Grizzly Report, Plaintiffs have done more than simply repackage that report as their Amended Complaint.   For starters, the Grizzly Report does

28

not rely on anonymous sources, but on a number of databases, press releases, and other publicly available information.  (*See, e.g.*, Dkt. 25-2, at ECF 5–8; 10–17.)  Therefore, the Grizzly Report itself contains a significant amount of attributed research and is not a short-seller report premised on statements from confidential witnesses.  Additionally, here, unlike the *Fanhua* lawyers, who did "nothing whatsoever" to confirm the statements in the short-seller report, Plaintiffs' lawyers have taken steps to corroborate the factual allegations made in the Grizzly Report.  *Id.* at 804.  For example, Plaintiffs accessed China's National Enterprise Credit Information Publicity System ("NECIPS") to confirm the alleged ownership structures for Jinxiaoer, ASFC, and Huayan alleged in the Grizzly Report.  (Dkt. 25, ¶¶ 41, 49, 89.)  Additionally, Plaintiffs reviewed records from Qixinbao—one of China's largest business databases—to further vet the statements about Huayan and ASFC in the Grizzly Report.  (*Id.* ¶¶ 12, 50, 90, 91, 108, 109.)   Finally, Plaintiffs examined information on the Jinxaoer platform available on app-purchasing websites in order to assess whether Tenet owned this asset.  (*Id.* ¶¶ 42, 100.)

Therefore, because the material found in the Grizzly Report was attributed to multiple publicly available sources, and because Plaintiffs were able to corroborate the Grizzly Report's assertions through public database research themselves, the misstatements set forth in the Amended Complaint are sufficiently alleged.  *See In re Ideanomics, Inc. Sec. Litig.*, No. 20-CV-4944 (GBD), 2022 WL 784812, at *8 (S.D.N.Y. Mar. 15, 2022) (sustaining a complaint where plaintiffs were able to corroborate the "majority" of claims in an anonymous-sourced short-seller report, even where plaintiffs could not establish the veracity of one of the report's claims).  Therefore, because Plaintiffs have posited "independent and particularized facts to corroborate" the information in the Grizzly Report by accessing the public records and other evidence on which

the Grizzly Reports relied, Plaintiffs have adequately alleged material misstatements for purposes of its Section 10(b) claim.  *See Fanhua*, 442 F. Supp. at 801.

Accepting all well-pleaded assertions of fact in the Amended Complaint as true, *see Iqbal,* 566 U.S. at 678, and drawing all reasonable inferences and resolving all doubts in favor of the non-moving party, *see Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995), the Court concludes that, under the standards of Rule 9(b) and the PSLRA, Plaintiffs have adequately pleaded at this stage of the litigation that Defendants made false or misleading statements in the Registration Statement, and the subsequent investor Q&A, by (1) specifying the statements that Plaintiffs allege were fraudulent, (2) identifying the speaker, (3) indicating when and where the statement was made, and (4) explaining why the statement was fraudulent.  *See Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000).

b.  <u>Scienter</u>

Rule 9(b) and the PSLRA require Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences."  *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 323).  The requisite mental state is one "embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted).  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322–23.  Ultimately, "[a] complaint will survive . . . only if a reasonable person would deem

the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

A complaint "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  And where a complaint does not sufficiently allege that defendants had a motive to defraud the public, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).  Plaintiffs argue that Defendants had both the motive and opportunity to commit fraud or, in the alternative, that they acted with recklessness when perpetrating this fraud.  (Dkt. 34, at 19–22.)

### (1) Motive and Opportunity

To begin with, there is no doubt that Defendants had the *opportunity* to manipulate the price of the "TNT" stock as the corporation and its corporate officers.  *See, e.g., In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 443 (S.D.N.Y. 2005) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers and corporate directors would have the opportunity to commit fraud if they so desired.") (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993)).  The closer question is whether Plaintiffs have adequately alleged motive. The Court finds that they have not.

The Amended Complaint contains relatively little information on Plaintiffs' theory of scienter.  Plaintiffs plead that Defendants "knew that the public documents and statements issued or disseminated in the name of Tenet were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws." (Dkt. 25, ¶ 139.)  Apart from the vague

and conclusory nature of these statements, Plaintiffs do not clearly explain the "why."  They argue in opposition to the motion to dismiss that Defendants "intentionally lied about the equity and assets acquisitions that did not even exist to artificially inflate Tenet's value."  (Dkt. 34, at 20.)  However, "[g]eneral allegations that defendants acted in their economic self-interest are not enough" to plead a strong inference of scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000).  Instead, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit*, 264 F.3d at 139; *see also In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 214 (S.D.N.Y. 2004) (same).  All Plaintiffs have done in this case is plead that, as a result of Defendants' actions, "the market price of Tenet common shares was artificially inflated."  (Dkt. 25, ¶ 141.)  On its own, that is insufficient.  *See, e.g.*, *Rombach,* 355 F.3d at 177 (2d Cir. 2004) (finding no inference of scienter where defendants' motives were to "artificially inflate and maintain the market price of . . . common stock[,]" "complete a previously arranged corporate acquisition[,] . . . and to retire debt"); *San Leandro Emergency Medical Grp. Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 813–14 (2d Cir. 1996) (holding that desire to maintain a high bond or credit rating to maximize marketability of a substantial debt issuance does not qualify as sufficient motive).

In response, Plaintiffs assert that because the "misstatements/lies" at issue in this case "directly relate to the acquisition of another company," motive can be found.  (Dkt. 34, at 20 (internal citation and quotations omitted).)  This argument is both inadequate and inapposite because it is entirely conclusory and improperly conflates the type of information with the requisite state of mind.

Therefore, Plaintiffs do not adequately allege scienter by demonstrating motive and opportunity.

(2) Conscious Misbehavior or Recklessness

Because the Court finds that Plaintiffs have not adequately pleaded motive, the Court assesses whether Plaintiffs have adequately pleaded, in the alternative, that Defendants' conduct was the product of conscious misbehavior or recklessness.  The Court finds that Plaintiffs have met this burden as to some—but not all—of the alleged misstatements.

"To prove intent based on a theory other than motive-and-opportunity, a securities fraud plaintiff must allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Bay Harbour Mgmt. LLC v. Carothers,* 282 F. App'x 71, 77 (2d Cir. 2008) (citation omitted).  "Recklessness is defined as 'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *ECA*, 553 F.3d at 198 (quoting *Novak,* 216 F.3d at 308).  The plaintiffs' allegations must show both "(1) *specific* contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (quoting *In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d 510, 536 (S.D.N.Y.2009)).  "Where motive is not apparent, . . . the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit,* 264 F.3d at 142.

Plaintiffs argue that upon publication of the Grizzly Report, Defendants "had a duty to verify the accuracy" of the Grizzly Report and that the exculpatory statements given by Joseph in the Q&A "show fraudulent intent" and "support scienter."  (Dkt. 34, at 22.)  The Court notes that this argument would necessarily apply only to the statements made *after* October 4, 2021, the day

33

the Grizzly Report was published.  Thus, this argument would potentially salvage only three of the six alleged misstatements: (1) Joseph's statement in the October 5, 2021 Q&A as to the Huayan acquisition (Dkt. 25, ¶ 113), (2) Joseph's statement in the October 5, 2021 Q&A as to the Jinxiaoer acquisition (*Id.* ¶ 118), and (3) Joseph's statement in the October 5, 2021 Q&A as to the ASFC acquisition (*Id.* ¶ 121).[18]  The Court finds that Plaintiffs' allegations as to these three statements are sufficient to demonstrate conscious misbehavior or recklessness by Defendants.

To begin with, the Grizzly Report qualifies as "specific contradictory information" that was available to Defendants "at the same time" that Defendant Joseph made his statements in the October 5, 2021 Q&A.  *Glaser*, 772 F. Supp. 2d at 588.  Additionally, it is readily apparent that Joseph, who was at "the highest corporate level" of Tenet, was "on notice" of facts contrary to his own Q&A statements relating to Jinxiaoer, Huayan, and ASFC after the October 4 publication of the Grizzly Report.  Indeed, Joseph's statements in the Q&A were in direct response to the Grizzly Report, which he acknowledged having read in his opening statement in the Q&A.  (Dkt. 25-3, at ECF 2.)  Therefore, Plaintiffs have sufficiently alleged scienter as to Joseph.  Tenet's scienter can be imputed from that of Joseph because the intent of an executive who acted with scienter can be imputed to a company.  *See UBS*, 875 F. Supp. 2d at 369 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F. 3d 190, 195 (2d Cir. 2008)).  Because the Amended Complaint does not plead specific—or any—facts indicating that Defendant Landreville acted with reckless disregard for the truth, Joseph's scienter cannot be imputed to him.  *See In re Wachovia*

---

[18] As discussed, scienter has not been sufficiently pleaded for the following statements made before publication of the Grizzly Report: (1) the Huayan statement made in the September 14, 2021 Press Release (Dkt. 25, ¶ 111), (2) the Jinxaoer statement made in an exhibit to Tenet's September 3, 2021 Registration Statement (*Id.* ¶ 115), or (3) the ASFC statement made in an exhibit to Tenet's September 3, 2021 Registration Statement (*Id.* ¶ 119).

*Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y.2011) (allegation that individual defendants "received reports detailing" problems insufficiently specific for a finding of scienter).

Defendants argue that there is an opposing inference to be made from the comments Joseph made in the October 5, 2021 Q&A, i.e., that Joseph was making "good faith efforts to describe complex foreign transactions" with respect to Jinxiaoer, Huayan, and ASFC.  (Dkt. 33-1, at 20.) However, the Court finds that a reasonable person would find "the inference of scienter"—i.e., that Joseph was trying to deceive the public about, or distract the public from looking further into, the supposed transactions with Jinxiaoer, Huayan, and ASFC—"cogent and at least as compelling as [the] opposing inference of nonfraudulent intent"—i.e., that Joseph was simply trying to break down complicated transactions.  *Tellabs*, 551 U.S. at 311.

Therefore, Plaintiffs have adequately pleaded scienter on a recklessness theory with respect to Defendant Joseph's (and Tenet's) three statements in the October 5, 2021 Q&A after publication of the Grizzly Report.  Scienter has not been adequately pleaded for any alleged misstatements that were made by Defendants before October 4, 2021 or as to Defendant Landreville.

### 3.   Reliance

Defendants lastly dispute that Plaintiffs—specifically Lead Plaintiff Handal[19]—relied on Defendants' allegedly fraudulent misconduct in purchasing or selling Tenet securities.  (Dkt. 33-1, at 23–24.)  The reliance prong of a *prima facie* case under 10(b) and 10b-5 is also often referred to as "transaction causation."  *See, e.g., Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-CV-1898 (SAS), 2005 WL 2148919, at *5 (S.D.N.Y. 2005).  To

---

[19] Because the Court must rely on the non-conclusory factual allegations in the Amended Complaint in deciding this motion, the Court declines to consider the email correspondence attached by Defendants in their motion to dismiss between Lead Plaintiff Handal and Tenet representatives.  (*See* Dkt. 33-6, at ECF 2–5.)

sufficiently allege transaction causation, a plaintiff must allege that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001). "A rebuttable presumption of transaction causation may be established under the fraud on the market theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale." *Teamsters Loc. 445 Freight Div. Pension Fund*, 2005 WL 2148919, at *5; *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 635 (S.D.N.Y. 2004) (citing *Basic*, 485 U.S. at 248–49) (explaining that under fraud-on-the-market theory "where there has been a misrepresentation to the securities marketplace, a rebuttable presumption arises that investors who purchased or sold securities in an efficient market relied upon the misrepresentation.").

The Amended Complaint states that Plaintiffs "relied on the statements [of Defendants] and/or the integrity of the market price of Tenet common shares during the Class Period in purchasing Tenet common shares at prices that were artificially inflated as a result of Defendants' false and misleading statements." (Dkt. 25, ¶ 141.) The Amended Complaint also invokes the fraud-on-the-market doctrine.[20] (*Id.*, ¶¶ 132–33.) To support this inference, Plaintiffs allege that Tenet's common stock was listed and actively traded on the OTC markets and on the Nasdaq, both "efficient markets." (*Id.*, ¶ 132.a.)

---

[20] Plaintiffs also include one paragraph invoking the *Affiliated Ute* presumption of reliance (Dkt. 25, ¶ 134), which can be applied in cases "involving *primarily a failure to disclose*." *Affiliated Ute v. United States*, 406 U.S. 128, 153 (1972) (emphasis added). This presumption relieves plaintiffs of the need to plead positive proof of reliance in order to recover under Section 10b-5. *Id.* Here, Plaintiffs' Amended Complaint points to misstatements, not omissions, so the *Affiliated Ute* presumption does not apply. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (concluding that investors were not entitled to the *Affiliated Ute* presumption because the complaint alleged numerous affirmative misstatements, and any alleged "omission" was "simply the inverse" of the misrepresentation allegations, and the presumption does not apply to "misstatements whose only omission is the truth that the statement misrepresents").

Defendants counter that Plaintiffs have not pleaded an efficient market because the OTC markets are "not presumed to be efficient," and Tenet's shares traded on the Nasdaq for only two weeks.  (Dkt. 36, at 8–9.)  First, the Court notes that because scienter has been established only as to the October 5 Q&A statements of Defendant Joseph, the securities purchases that survive this motion to dismiss are those transactions that occurred on the OTC markets, because by October 5, 2021, Tenet's common stock had been withdrawn from Nasdaq.  Therefore, the Court does not analyze the Nasdaq for reliance purposes.  And while Plaintiffs clearly assert in their opposition that the *Nasdaq* is an efficient market, neither their opposition nor the Amended Complaint provides any detail as to whether the *OTC* markets are also efficient for purposes of establishing reliance via fraud-on-the-market.  The Court follows other courts in this district in finding that the OTC markets are not presumed to be efficient.  *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011) ("[W]hile the Nasdaq is recognized as maintaining an efficient market[,] . . . the Court is unaware of any court holding that the OTCBB . . . meet[s] this same standard.") (internal quotations omitted) (citing *Burke v. China Aviation Oil (Singapore) Corp., Ltd.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005))).

Even if the OTC markets were efficient, however, Plaintiffs still would not be able to establish reliance.  This is because the surviving alleged misstatements were the October 5, 2021 statements of Defendant Joseph at the Q&A.  Because Lead Plaintiff Handal purchased Defendants' stock between September 14, 2021 and September 15, 2021, (Dkt. 25, ¶ 19), and named Plaintiff Dominique purchased Defendants' stock on September 9, 2021, (*Id.* ¶ 20), they necessarily did not rely on the only actionable misrepresentations in this case, which were made on October 5, 2021.

Therefore, reliance has not been sufficiently pleaded.

*     *     *

In sum, Plaintiffs have sufficiently alleged material misstatements.  They have also adequately pleaded scienter on the part of Tenet and Defendant Joseph as to the three October 5 Q&A statements.  They have *not* adequately pleaded scienter as to Defendant Landreville, nor have they adequately alleged scienter as to the (1) the Huayan statement made in the September 14, 2021 Press Release (*Id.* ¶ 111), (2) the Jinxaoer statement made in an exhibit to Tenet's September 3, 2021 Registration Statement (*Id.* ¶ 115), or (3) the ASFC statement made in an exhibit to Tenet's September 3, 2021 Registration Statement (*Id.* ¶ 119).  Finally, with respect to the three alleged misstatements as to which scienter has been sufficiently pleaded, Plaintiffs have failed to adequately allege reliance because their purchases were made before the three actionable misstatements occurred and because the OTC markets are not presumed to be efficient.

For these reasons, the Court dismisses Count Three of the Amended Complaint without prejudice, to the extent Plaintiffs can plead any additional facts that would cure the deficiencies identified herein.

## B.  Count Four: Violation of Section 20(a) of the Exchange Act – Control Person Liability

"Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law."  *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (citing 15 U.S.C. § 78t(a)).  Because Plaintiffs have failed to state a claim for a primary violation under the Exchange Act against Defendants, Plaintiffs cannot establish control person liability under the Act.  Accordingly, Count Four is also dismissed.  *ATSI*, 493 F.3d at 108.

**LEAVE TO AMEND**

Plaintiffs have requested leave to amend the Complaint in the event of dismissal.  (Dkt. 34, at 26 n.35.)  Pursuant to Rule 15(a), leave to amend a complaint "shall be freely granted when justice so requires."  Fed. R. Civ. P. 15(a).  Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *See Morrone v. CSC Holdings Corp.*, 404 F. Supp. 2d 450, 455 (E.D.N.Y. 2005) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).  Plaintiffs are therefore granted leave to replead within thirty (30) days of this Memorandum & Order.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Plaintiffs are granted leave to amend the Amended Complaint to cure any deficiencies identified herein within thirty (30) days.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 25, 2023
      Brooklyn, New York